**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald Douglas FRANKLIN, Jr.,**
**Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**William Edward Piers, Defendant–**
**Appellant.**

**Nos. 01–30226, 01–30291.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 6, 2003.

Filed March 17, 2003.

Allison Mendel, Mendel & Associates, Anchorage, AK, for defendant-appellant Franklin.

Fay Arfa, A Law Corporation, Los Angeles, CA, for defendant-appellant Piers.

Donald Marks, Los Angeles, CA, for defendant-appellant Piers.

Mark A. Rosenbaum, Assistant United States Attorney, District of Alaska, for the plaintiff-appellee (No. 01–30226).

Steven L. Lane, U.S. Department of Justice, Washington, D.C., for the plaintiff-appellee (No. 01–30291).

Monica S. Abrams, U.S. Department of Justice, Washington, D.C., for the plaintiff-appellee (No. 01–30291).

Before: WALLACE, TROTT and TASHIMA, Circuit Judges.

TROTT, Circuit Judge:

Donald Douglas Franklin, Jr., ("Franklin") and William Edward Piers ("Piers") planned the armed robbery of a credit union. The robbery itself was carried out by Piers and Raymond Hubbard ("Hubbard"). Franklin appeals the sentence entered on his guilty pleas to charges stemming from the robbery, and Piers appeals his six convictions. We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

## BACKGROUND

Piers and Franklin decided to rob the credit union where Franklin worked. Franklin provided Piers with security information, details of credit union operations and procedures, and the location of the vault. Franklin and Piers developed a written plan for the robbery and their escape. At his plea hearing, Franklin acknowledged that they planned to use handguns "in a threatening manner" during the robbery. On October 15, 1999, Piers and Franklin approached the credit union with the intent to execute their plan, but got into an argument and abandoned their attempt.

On June 27, 2000, Piers and Hubbard succeeded in committing the robbery. Piers and Hubbard drove to the credit union in a stolen van and waited for employees to arrive. When a credit union employee entered the building, Piers pushed inside the door while Hubbard waited outside in the van. Piers triggered an alarm when he removed money from the teller drawers. As police proceeded to the credit union, Piers exited the building, got into the van, and Hubbard sped away. Officers attempted to stop Hubbard, but he made a U-turn and kept driving. In their attempt to evade police, Piers fired shots from the getaway van at the officers. Hubbard drove the van behind a strip mall and then into a trailer park where they changed vehicles. Piers drove the second vehicle until it became stuck in a chain link fence and they were apprehended by police.

Franklin pled guilty to conspiracy to commit armed robbery (Count I), conspiracy to use, carry or possess a firearm in relation to a crime of violence (Count III), and attempted armed robbery (Count VII). The district court sentenced Franklin to 60 months on Count I and 150 months on each of Counts III and VII, to be served concurrently, followed by three years of supervised release.

After a five-day jury trial, at which Hubbard testified for the government, Piers was convicted of six crimes: conspiracy to commit armed robbery (Count I); armed robbery (Count II); conspiracy to use, carry or possess a firearm in relation to a crime of violence (Count III); using, carrying or possessing a semiautomatic assault weapon (Count IV); using, carrying or possessing an automatic machine gun (Count V); and, possession of a firearm with the serial number removed or altered (Count VI). The district court sentenced Piers to concurrent 60–month terms on Counts I and VI; concurrent 108–month terms on Counts II and III; and a 120–month term on Count IV and 360 months on Count V, to be served concurrent with each other but consecutive to the terms imposed on Counts I, II, III, and VI.

## DISCUSSION

### I Franklin

Although Franklin was not present at the June 27th robbery, the district court

applied a seven-level enhancement for discharge of a firearm on that occasion pursuant to U.S.S.G. § 2B3.1(b)(2)(A), and a two-level enhancement pursuant to U.S.S.G. § 3C1.2 for reckless endangerment in attempting to evade police after the robbery. Franklin challenges these enhancements.

## A. Standard of Review

■■■ We review de novo the district court's application of the sentencing guidelines. *United States v. Young*, 33 F.3d 31, 32 (9th Cir.1994). The district court's factual findings in the sentencing phase are reviewed for clear error, including its determination of whether a defendant's conduct constituted reckless endangerment, *id.*, and whether a co-conspirator's actions were reasonably foreseeable, *United States v. Lavender*, 224 F.3d 939, 941–42 (9th Cir.2000).

## B. Discharge of a Firearm

" '[I]n the case of jointly undertaken criminal activity,' the sentencing court should take into account 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction.' " *United States v. Zelaya*, 114 F.3d 869, 871 (9th Cir.1997) (quoting U.S.S.G. § 1B1.3(a)(1)(B)). The district court found it was "clear" that Franklin "knew and planned that guns would be brandished" and it was "entirely foreseeable that guns would be fired" when attempting to escape after the robbery. Based on this finding, the district court imposed this enhancement.

■■■ Franklin argues that the district court erred because, as the months passed after Franklin and Piers first attempted to rob the credit union, Franklin did not believe the robbery would occur, and thus could not reasonably foresee the discharge of a firearm during its commission. Franklin, however, did nothing formally to withdraw from the conspiracy. Moreover, up to two months prior to the June robbery, Franklin continued to provide Piers with information regarding the credit union's security procedures. Franklin knew of the robbery plans and agreed with Piers that weapons should be used "in a threatening manner" during the robbery. Accordingly, Franklin remained responsible for the foreseeable acts of the conspiracy of which he was a part. Hence, the district court did not clearly err in finding that the discharge of a firearm was reasonably foreseeable in this case, and we affirm its application of the seven-level enhancement.

## C. Reckless Endangerment

The Sentencing Guidelines provide for a two-level enhancement when a defendant "recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. Notwithstanding Franklin's absence from the scene of the robbery and the attempted escape of his confederates, the district court applied this enhancement to Franklin based on Piers's and Hubbard's reckless driving when attempting to evade police. The district court applied the enhancement because the original plan developed by Franklin and Piers included the use of two getaway cars. The district court explained that the plan formulated by Piers and Franklin "specifically ... contemplated the use of vehicles, indeed, two vehicles, to effect the escape," and determined that "it was entirely foreseeable that some unplanned event might cause the presence of police officers or someone else who could get in the way of the escape."

Knowingly participating in an armed robbery in which getaway vehicles are part of the plan is insufficient as a matter of law, without more, to allow a district court to impose this enhancement on individuals not directly committing the acts amounting to reckless endangerment. "Not every escape escalates into reckless endangerment during flight," *Young*, 33 F.3d at 33, and the conduct that recklessly endangers must be more than reasonably foreseeable. "At a minimum, the Government must establish that [a defendant] did more than just willfully participate in the getaway chase" for the enhancement to apply. *Young*, 33 F.3d at 32(declining to apply this enhancement to defendants who were merely passengers during the getaway). The government "must prove that each defendant was responsible for or brought about the driver's conduct in some way." *Id.* at 32–33.

Here, the government did not adequately demonstrate as required by *Young* that Franklin "aided or abetted, counseled, commanded, induced, procured, or willfully caused" the driver's conduct that recklessly endangered. U.S.S.G. § 3C1.2 cmt. n. 5 (2000). Accordingly, we reverse the district court's application of section 3C1.2, vacate Franklin's sentence, and remand for resentencing without this enhancement.

## II Piers

Piers requests that we reverse his convictions on several grounds.

### A. Substitution of Counsel

Piers argues first that the district court should have allowed his retained attorney to withdraw so he could obtain new counsel. Piers did not formally move for substitution of counsel, but his actions and those of his trial counsel were consistent with the desire for new representation.

On January 26, 2001, Piers's mother wrote his trial counsel, Rex Butler, and requested that he withdraw from Piers's case. On January 30, 2001, six days before Piers's trial was scheduled to begin, Butler filed a motion to withdraw, stating that (1) the Piers family "is unhappy with my services"; (2) Piers "is unable and or unwilling to pay for the trial"; and (3) his motion is based on "the break down in attorney client communications."

Assuming, without deciding, that Butler's request to withdraw was tantamount to a motion for substitution, we conclude that the district court did not abuse its discretion. On January 31, 2001, the district court conducted a hearing on the motion to withdraw. The hearing began with Piers explaining to the district court why he wanted Butler to withdraw:

> I feel that there's been a gross negligence and a maleficence on the part of the [FBI and Anchorage Police Department] due to the lack of investigation regarding the information that they've been given and ... they've focused on me from the beginning.
>
> ... [A]nd the paperwork that I've generated while I've been held hasn't been acted upon by my counsel because I assumed that there was a lack of funds, but there's a lot of investigations that I wanted completed, and there's a lot of people that I expected to be interviewed and a lot of other work done. So I don't know what to do....

Butler responded that he had read everything Piers had written him and had attempted to explain the trial process to Piers, but Butler believed Piers "misunderstood the process to some degree." Butler indicated that early on he had problems seeing Piers "because there were times [he would] go down to the jail and [Piers] wouldn't see [him] because [Piers's]

mother told him not to unless she was in town or something like that."

Piers responded that "these things aren't true," and said he did not believe Butler had his "best interest at heart." Piers continued, "I don't have anything against you, Mr. Butler, but you haven't acted upon the evidence that I've given you or the information, and I have proof to that effect. And there's a lot of motions that I wanted to be made and things to look into regarding statements." Piers asserted that Butler had "never responded to [his] questions" and has not "provided [him] any legal counsel." Piers also complained that "[t]he FBI hasn't attempted to do any investigations on the information that I've given to [Mr. Butler]."

Butler explained to the court that Piers had given him "bits and pieces of information that . . . is just nothing to take a lead on." Butler said he had spoken with the prosecutor "on a number of occasions to try and see" if the prosecutor had any information that "remotely resembled" the information Piers provided. Butler explained that the information Piers provided consisted of items like a first name, with nothing else to follow up on. Butler described the majority of Piers's requests as related to trial issues and strategies and how to utilize information. The district court gave Piers another opportunity to comment, and Piers complained about the Anchorage Police Department and the fact that he received more discovery from the Public Defender's Office when they represented him early in the case than from Butler.

The district court told Piers he was receiving representation from "one of the more experienced lawyers that appears in this court." The district court noted that the "attorneys in this case have had way more than the normal amount of time to work with this case" and decided to proceed with the trial "as scheduled." The district court acknowledged that it understood Piers and Butler "may be on different sheets of paper as far as defense tactics," but advised Piers that Butler is the one "trained in legal defense work." The district court denied the motion to withdraw.[1]

■■■ Piers argues that the district court failed to conduct an adequate inquiry to determine the nature and extent of the breakdown in his relationship with his trial attorney and that the district court focused only on Butler's competency. We review for abuse of discretion a district court's denial of a motion for substitution of counsel. *United States v. Nguyen,* 262 F.3d 998, 1004 (9th Cir.2001). "In reviewing a denial of substitution of counsel, we consider (1) the timeliness of the motion; (2) the adequacy of the trial court's inquiry; and (3) the extent of conflict created." *Id.*

### 1. Timeliness

■■■ Piers first brought to his attorney's attention that he was dissatisfied with his representation a mere ten days before trial. Four days later, only six days before trial, Butler submitted a motion to withdraw. The trial had already been postponed once upon a motion by Piers. Piers's interest in obtaining new counsel was based, in part, on his desire to have "a lot of motions . . . be made and things[looked] into regarding statements." New counsel would likely have needed a substantial continuance to comply with Piers's desired actions. Given these circumstances, Piers's motion was not timely. *See United States v. Garcia,* 924 F.2d 925, 926(9th Cir.1991) (concluding a motion

---

1. The district court informed Butler that it would act to change his status to CJA counsel so that he would be paid for his continuing representation.

made "a mere six days before" the trial was scheduled to begin was untimely, in part because a "continuance would almost certainly have been required").

## 2. Adequacy of Inquiry

As set forth in detail above, the district court allowed Piers to speak at great length about his reasons for desiring new counsel, allowed both Piers and Butler to address the extent of their communication, and confirmed that Butler was prepared for trial. *See United States v. Smith*, 282 F.3d 758, 763–64 (9th Cir.2002) (finding the inquiry adequate where the court allowed the defendant to support his papers with oral argument and the court "patiently and exhaustively queried Smith about the extent of communication" with his attorney and confirmed that the attorney was prepared for trial).

The district court's questions were open-ended, but this format is "not always inadequate." *United States v. Adelzo–Gonzalez*, 268 F.3d 772, 777 (9th Cir.2001). Even though the district court's questions were general, Piers and Butler were allowed sufficiently to detail the reasons for Butler's request to withdraw as counsel. Our review of the record and the transcript of the proceedings satisfies us that the district court's inquiry was adequate; it "generate[d] a 'sufficient basis for reaching an informed decision.'" *Smith*, 282 F.3d at 764 (citation omitted).

## 3. Extent of Conflict

Piers has not demonstrated that an extensive conflict existed with Butler. The main source of Piers's dispute with Butler centered around defense and litigation tactics. While the district court emphasized Butler's competence when ruling on the motion, it also viewed the conflict as one related to "defense tactics." "Litigation tactics are decisions generally left to defense counsel." *Smith*, 282 F.3d at 763(citation omitted). Considering the context of the dispute, and weighing the three relevant factors, we conclude that the district court did not abuse its discretion in this case.[2]

## B. Sufficiency of the Evidence

Normally, sufficiency of the evidence claims are reviewed to determine whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Booth*, 309 F.3d 566, 574 n. 5 (9th Cir.2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)). However, because Piers did not move for acquittal, our "standard of review looks to plain error or the prevention of a manifest miscarriage of justice." *United States v. Timmins*, 301 F.3d 974, 983 (9th Cir.2002).

Piers claims that Counts IV and V should be dismissed because there was insufficient evidence to prove that Piers rather than Hubbard used a gun[3] during the robbery. Piers argues that no fingerprints were found on the Norinco and "[a]ll

---

**2.** Piers argues also that he was denied his Sixth Amendment right to effective assistance of counsel. When reviewing a Sixth Amendment claim, we consider the same factors applied to review a district court's denial of substitution of counsel. *United States v. Moore*, 159 F.3d 1154, 1158–59 (9th Cir. 1998). For the same reasons his request for substitution failed, Piers has not demonstrat-

ed a conflict serious enough to warrant concluding that his Sixth Amendment right to counsel was denied.

**3.** The charges in Counts IV and V are based on Piers's use of the same gun, a "Norinco" converted to operate in either an automatic or a semi-automatic setting.

the credible evidence pointed to Hubbard as the shooter." We disagree.

■■■ Hubbard testified that he heard a "short burst" of shots when he was driving the getaway van. Hubbard specified that he "turned to see [Piers] cock the gun ... and shoot." Hubbard testified also that Piers had a rifle with him when they switched getaway vehicles.

Piers nonetheless argues that Hubbard's testimony was "incredible and insubstantial on its face." Piers attacked Hubbard's credibility at trial, providing the jury with an opportunity to evaluate Hubbard's motives and credibility. We do not "question a jury's assessment of witnesses' credibility," but rather presume in these circumstances "that the trier of fact resolved any ... conflict[ing inferences] in favor of the prosecution." *United States v. Johnson,* 229 F.3d 891, 894 (9th Cir.2000) (alterations in original) (internal quote marks and citations omitted).

In addition, other testimony pointed to Piers as the shooter. A government witness who tested the Norinco testified it was "very difficult to control even using two hands." The jury could have inferred from this testimony that Hubbard could not have shot the gun and driven the van at the same time. Sufficient evidence exists from which a rational trier of fact could conclude Piers was the shooter, and Piers has not demonstrated plain error or a manifest miscarriage of justice warranting reversal on this issue.

■■■ Piers claims also that the government failed to present sufficient evidence to prove Piers knew of the automatic nature of the Norinco because it was internally converted and looked like a semi-automatic weapon. A firearms expert testified that the Norinco's internal components had been altered to allow fully automatic use. Police found internal components matching the Norinco in Piers's bedroom. In addition, a "detent" on the *outside* of the Norinco allows the user to set it in a fully automatic firing position. This evidence was sufficient for a rational jury to find that Piers knew the weapon was capable of being fired in an automatic setting. We conclude that there was no manifest injustice or plain error in Piers's convictions.

### C. Jury Instructions

### 1. Knowledge of the Firearm's Nature

■■■ Piers argues that the district court should have instructed the jury that they must find Piers "knew the internally modified weapon operated as an automatic firearm." Because Piers did not object to this portion of the jury instructions at trial, we review his claims for plain error. *Smith,* 282 F.3d at 765. "Plain error requires an (1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (citing *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). "If these three conditions are met, we may exercise our discretion to notice the error, but only if it (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

The district court instructed the jury that, based on the definition of "machine gun" provided, they must find Piers *"knowingly* used or carried a machine gun during and in relation to the crime charged ... or *knowingly* possessed a machine gun." (Emphasis added.) This instruction was free from plain error.

### 2. Accomplice Instruction

■■■ Piers argues also that the district court should have given his requested accomplice instruction with regard to Hubbard's testimony. We review for abuse of discretion a district court's formulation of jury instructions, considering "the instruc-

tions as a whole, and in context." *United States v. Stapleton,* 293 F.3d 1111, 1114 (9th Cir.2002).

 The district court instructed the jury to "carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief." The district court also instructed the jury to consider each witness's "motive" and to "[c]onsider also any relation each witness may bear to the other side of the case." In a separate instruction, the district court informed the jury that:

> Raymond Lee Hubbard II has pled guilty to crimes arising out of the same events for which the defendant is on trial. This guilty plea is not evidence as to the defendant and you may consider it only in determining this witness' believability. *You should consider this witness' testimony with great caution,* giving it the weight you feel it deserves.

(Emphasis added).

Given the instructions as a whole, the district court did not abuse its discretion by refusing to further instruct the jury that Hubbard was an accomplice of Piers and that it "should consider [his] testimony with greater caution than that of other witnesses." The district court accomplished the same objective with the instructions provided. Accordingly, we affirm Piers's convictions.[4]

### D. The Section 924(c) Convictions

 Lastly, Piers argues that the jury should have been required unanimously to decide whether the Norinco was an automatic or semiautomatic weapon because it was the basis for the section 924(c)

charges in both Counts IV and V. The evidence at trial demonstrated that the Norinco operated as both an automatic and semi-automatic weapon, supporting convictions on both counts. However, the district court should have consolidated Counts IV and V, because they were based on Piers's use of the same firearm during the same predicate offense, the robbery. Multiple counts charged under section 924(c)(1) must be consolidated "either before or after trial, and before sentencing, so that there will be only one section 924(c)(1) conviction for [the] one predicate offense." *United States v. Martinez,* 7 F.3d 146, 148 (9th Cir.1993).

The district court properly submitted the separate counts to the jury, but because more than one conviction resulted, the court should have merged the convictions after trial and sentenced Piers only on Count V for the use of an automatic weapon in violation of § 924(c)(1)(B)(ii). *Id.* at 149 ("[W]here a defendant is convicted for using multiple weapons under 18 U.S.C. § 924, the district court must sentence the defendant according to the most dangerous weapon used or carried in the offense."). Accordingly, the sentence on Count IV is vacated and the case remanded for resentencing with instructions to consolidate Counts IV and V, impose the mandatory minimum 360–month sentence on Count V, and reenter judgment.

### CONCLUSION

We affirm the district court's seven-level enhancement of Franklin's offense level for discharge of a firearm, but reverse its two-level enhancement for reckless endangerment. Accordingly, we vacate Franklin's sentence and remand for resentenc-

---

4. Piers argues that his convictions should be reversed because of cumulative error. We reject this argument. Because no individual errors underlying his convictions have been demonstrated, no cumulative error exists.

ing. We affirm Piers's convictions, but vacate the sentence imposed on Count IV and remand for resentencing with instructions to consolidate Counts IV and V and reenter judgment.

AFFIRMED in part, REVERSED in part, and REMANDED.