**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JEFFREY H. FEINGOLD,
        *Defendant-Appellant.*

No. 05-10037

D.C. No.
CR-02-00976-SMM

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted
April 4, 2006—San Francisco, California

Filed July 21, 2006

Before: Alfred T. Goodwin, Betty B. Fletcher, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge B. Fletcher

## COUNSEL

Michele R. Moretti, Lake Butler, Florida, for the appellant.

Paul Charlton, United States Attorney, John Joseph Tuchi, Deputy Appellate Chief, Linda C. Boone, Assistant United States Attorney, Phoenix, Arizona, for the appellee.

## OPINION

B. FLETCHER, Senior Circuit Judge:

Under the Controlled Substances Act (CSA), it is unlawful for "any person" knowingly or intentionally to distribute or dispense a controlled substance. 21 U.S.C. § 841(a). Although the CSA makes exceptions to this prohibition for certain individuals who are registered "practitioners" under the Act, such as physicians and pharmacists, *see* 21 U.S.C. §§ 821-23, the Supreme Court has held that these practitioners are still subject to criminal prosecution "when their activities fall outside the usual course of professional practice." *United States v. Moore*, 423 U.S. 122, 124 (1975); *see also* 21 C.F.R. § 1306.04 (providing that a practitioner "shall be subject to the penalties . . . relating to controlled substances" unless the prescriptions he writes are "issued for a legitimate medical purpose . . . [and he is] acting in the usual course of his professional practice"). Thus, a physician remains criminally liable when he ceases to distribute or dispense controlled substances as a medical professional, and acts instead as a "pusher." *Moore*, 423 U.S. at 138, 143.

Dr. Jeffrey Feingold, a naturopathic physician licensed by the State of Arizona, was convicted on 185 counts of illegally

distributing controlled substances, in violation of 21 U.S.C. § 841(a). He contends that his conviction is constitutionally infirm due to improperly admitted testimony and erroneous jury instructions. The thrust of both of these objections is that the district court permitted the jury to convict him upon finding that he was merely an incompetent doctor, rather than upon the necessary finding that his conduct was so egregious as to render him criminally liable. He also argues that his sentence is invalid because the district court improperly relied on facts not found by the jury and because the district court denied his request for a two-level reduction in his offense level.

Although we hold that Dr. Feingold's arguments are without merit, we vacate his sentence and remand for resentencing pursuant to *United States v. Beng-Salazar*, No. 04-50518 (9th Cir. July 6, 2006).

## I.

Dr. Feingold graduated in 1976 from the National College of Naturopathic Medicine and, after completing an internship and residency, began his career in Philadelphia. In 1990, he moved to Arizona, where he later opened his own practice. In 2000, the State of Arizona granted naturopathic physicians authority to prescribe Schedule II, III, IV, and V controlled substances. In August of 2002, Arizona curtailed this authority, prohibiting naturopathic physicians from prescribing Schedule II drugs, with the exception of morphine. Dr. Feingold obtained from the Drug Enforcement Agency (DEA) the necessary certification to prescribe controlled substances. The prescriptions written by him pursuant to this certification became the basis for a 185-count indictment. The government alleged that Dr. Feingold abused his status as a licensed practitioner to distribute controlled substances outside the course of his professional practice.

At trial, the government presented evidence from several of Dr. Feingold's so-called patients. Their testimony against him

overwhelmingly demonstrated his disregard for proper prescribing practices. For example, several patients testified that they received prescriptions from Dr. Feingold even though he had never physically examined them and even though he never recorded the medical basis for prescribing these controlled substances in his patients' medical charts. Other patients testified that he had given them controlled substances even though he knew that they were recovering drug addicts. Others testified that they received prescriptions even though Dr. Feingold had never met with them. Dr. Feingold provided pills to one patient in exchange for having the patient paint his house, even though the prescriptions had ostensibly been issued for the patient's back pain. The record also indicates that Dr. Feingold continued to prescribe Schedule II narcotics even after Arizona had revoked the authority of naturopathic physicians like him to prescribe them.

Further, Dr. Feingold prescribed these substances in excess of the maximum dosages he recommended. In one case, in a single month he provided twenty-eight prescriptions to one patient, each for 120 pills — a total of more than 3,000 Oxycodone and Oxycontin pills. In another case, he prescribed as many as 2,000 pills in a single month, despite the fact that the recommended maximum dosage would have allowed the consumption of only 186, to a patient who testified that he resold the pills to others. He liberally provided prescriptions for Hydrocodone, Percocet, Vicodin, Valium, Oxycontin, Oxycodone, and morphine, sometimes refilling these prescriptions at intervals of only two days, or even daily. Dr. Feingold also charged his patients by the number of prescriptions he wrote.

The evidence presented by Dr. Feingold's "patients" also included the testimony of two undercover DEA agents who had obtained prescriptions for controlled substances both for themselves and for each other. Dr. Feingold issued prescriptions to one of these agents without examining her, and on one occasion, before he had even met her. At least one of these prescriptions was written for a Schedule II drug after

Arizona had made it illegal for naturopathic physicians to dispense them. Finally, these agents testified that Dr. Feingold had advised them to refill their prescriptions at a particular pharmacy because certain other pharmacists had refused to fill his prescriptions.

In addition to this evidence, the government presented two expert witnesses — a naturopathic doctor named Dr. Thomas Kruzel, and a medical doctor named Dr. Michael Ferrante. Both experts testified about the standard of care with which medical professionals generally must comply, and both of them indicated that Dr. Feingold's conduct fell far short of applicable professional standards. For instance, Dr. Kruzel testified that many of the prescriptions written by Dr. Feingold were "medically unnecessary" and that Dr. Feingold's practice of prescribing narcotic drugs without conducting adequate physical examinations or taking his patients' medical history was "highly unusual" and "outside the usual course of naturopathic medicine." Likewise, Dr. Ferrante testified that Dr. Feingold's prescription practices had failed to comply with generally observed professional guidelines, that Dr. Feingold had kept inadequate records, and that Dr. Feingold had prescribed unusually high and frequent doses of narcotic drugs. In addition, both experts consistently and unambiguously testified that Dr. Feingold's conduct was outside the course of usual professional practice and that there was no legitimate medical purpose for the 185 prescriptions identified in the indictment.

In his defense, Dr. Feingold presented as an expert witness a naturopathic doctor named Dr. Michael Cronin. This expert initially indicated that he believed a legitimate medical purpose existed for all of Dr. Feingold's prescriptions and that Dr. Feingold had issued all of his prescriptions in the good-faith belief that his patients needed them. He explained that the prescription of high levels of opioid medications was not atypical in treating pain. On cross-examination, however, the expert retracted much of his testimony and admitted that the

volume and frequency of most of the prescriptions was proba-
bly "excessive" and "outside the usual course of professional
practice and without a legitimate medical reason."

Finally, Dr. Feingold testified in his own defense. He
admitted writing all of the prescriptions identified in the
indictment. He also admitted that, in retrospect, the prescrip-
tions he issued were not used for a valid medical purpose, that
he was practicing as an "incompetent" doctor, and that his
method of prescribing controlled substances would be consid-
ered "outside the usual course of professional practice." He
explained, however, that the reason for these excessive pre-
scriptions was that he lacked training in "opioid medication
management" and that he "wasn't trained to recognize opioid
seekers." He claimed that he had always issued prescriptions
in the genuine belief that they were necessary to treat his
patients' legitimate and serious medical conditions. Dr. Fein-
gold insisted that he had been prescribing the drugs in good
faith to help his patients manage their pain and that he had
naively believed them when they told him they needed more
pills.

The district court instructed the jury that it had to find three
elements in order to convict Dr. Feingold under § 841(a) as a
licensed practitioner:

> First, the government must prove beyond a rea-
> sonable doubt that the defendant distributed a con-
> trolled substance. . . .

> Second, the government must prove beyond a rea-
> sonable doubt that the defendant distributed the con-
> trolled substance knowingly and intentionally. . . .

> Third, the government must prove beyond a rea-
> sonable doubt that the defendant prescribed or dis-
> tributed the controlled substance other than for a

legitimate medical purpose and not in the usual course of professional practice.

In addition, the district court provided the following supplemental instructions:

> A practitioner may not be convicted of unlawful distribution of controlled substances when he distributes controlled substances in good faith to patients in the regular course of professional practice. Only the lawful acts of a practitioner, however, are exempted from prosecution under the law. A controlled substance is distributed by a practitioner in the usual course of his professional practice if the substance is distributed by him in good faith in medically treating a patient. Good faith is not merely a practitioner's sincere intention towards the people who come to see him, but, rather, it involves his sincerity in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in the country. Thus, good faith in this context means an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country. However, practitioners who act outside the usual course of professional practice and prescribe or distribute controlled substances for no legitimate medical purpose may be guilty of unlawful distribution of controlled substances.

After deliberation, the jury convicted Dr. Feingold on all 185 counts. The district court calculated the offense level under the sentencing guidelines as 32, based on the quantity of drugs illegally prescribed by Dr. Feingold, as well as on its finding that Dr. Feingold had abused a position of public trust. The district court sentenced Dr. Feingold to 60 months for those counts that were subject to a statutory maximum, and to

144 months for the counts that were governed by the sentencing guidelines, with all sentences to run concurrently.

Dr. Feingold now appeals his conviction and his sentence.

## II.

Dr. Feingold claims that the district court improperly allowed expert witnesses to testify about the standard of care applicable to the distribution of opioid and other drugs. He argues that their testimony not only misled the jury by claiming a consensus among medical professionals in a field where none exists, but also was irrelevant and prejudicial because it prompted the jury to convict him of criminal offenses where at most he was a negligent doctor.

**[1]** We review a district court's evidentiary rulings for abuse of discretion. *See, e.g.*, *United States v. Alvarez*, 358 F.3d 1194, 1205 (9th Cir. 2004). Here, we conclude that the testimony about the applicable standard of care was relevant and therefore admissible. We agree with Dr. Feingold's observation that a violation of the standard of care alone is *insufficient* to support the criminal conviction of a licensed practitioner under § 841(a). But we do not agree that evidence of the governing standard of care is *irrelevant* or *prejudicial*. To the contrary, only after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the "usual course of professional practice" that his actions become criminal. *Moore*, 423 U.S. at 124.

**[2]** Both the Supreme Court and this court have allowed juries to assess the prevailing standards of care among medical professionals in cases involving the criminal prosecution of licensed practitioners. *See id.* at 126 (noting the practitioner's concession "that he did not observe generally accepted medical practices"); *United States v. Boettjer*, 569 F.2d 1078, 1081 (9th Cir. 1978) (noting that the standard for criminal lia-

bility "itself imports considerations of medical legitimacy and accepted medical standards"). As we explained in *Boettjer*, evidence regarding the applicable standard of care is "not offered to establish malpractice, but rather to support the absence of any legitimate medical purpose in [the practitioner's] prescription of controlled substances." 569 F.2d at 1082. Knowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but as a "pusher" whose conduct is without a legitimate medical justification. The district court therefore did not abuse its discretion in admitting evidence relating to the standard of care.[1]

## III.

Dr. Feingold raises two objections to the jury instructions. Although we review the "precise formulation" of jury instructions only for abuse of discretion, we review such instructions *de novo* to determine whether they misstate the elements of a crime. *See United States v. Shipsey*, 363 F.3d 962, 966 n.3 (9th Cir. 2004). Here, the thrust of Dr. Feingold's arguments is that the district court effectively misrepresented the elements of the crime. We therefore review the jury instructions *de novo*.

### A.

Dr. Feingold first argues that the instructions permitted the jury to convict him without an adequate determination of his *mens rea*. He argues that, to convict a licensed practitioner under § 841(a), a jury must look into his subjective state of

---

[1]To the extent that the government's evidence, as Dr. Feingold characterizes it, created the illusion of a consensus among the medical community when no agreement actually exists about the applicable standard of care, the proper response to this problem was for him to present evidence (as he actually did at trial) of the purported disputes within the medical community, not for the trial court to exclude any and all evidence relating to the standard of care.

mind and determine that he intended to act outside the course of his professional practice. He contends that his conviction is invalid because the jury instructions did not require the jury to do so in his case. *See, e.g.*, *United States v. Nguyen*, 73 F.3d 887, 894-95 (9th Cir. 1995) (reversing a conviction where the jury instructions failed to require a finding of intent).

We agree with Dr. Feingold's contention that a practitioner who acts outside the usual course of professional practice may be convicted under § 841(a) only if he does so intentionally. If a practitioner's distribution of controlled substances becomes illegal only by virtue of the fact that his actions are "outside the usual course of professional practice," *Moore*, 423 U.S. at 124, it follows that the practitioner must have deliberately acted in this fashion in order for him to be convicted of a crime. *See Morissette v. United States*, 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."). As we emphasized in *United States v. Rosenberg*, 515 F.2d 190 (9th Cir. 1975), "the jury [must] look into [a practitioner's] mind to determine whether he prescribed the pills for what he thought was a medical purpose or whether he was passing out the pills to anyone who asked for them." *Id.* at 197.

**[3]** Simply put, to convict a practitioner under § 841(a), the government must prove (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs *and with intent to distribute them outside the course of professional practice*. In other words, the jury must make a finding of intent not merely with respect to distribution, but also with

respect to the doctor's intent to act as a pusher rather than a medical professional. Here, Dr. Feingold contends that the district court's instructions relieved the jury of its burden to make this additional finding of intent.

**[4]** Contrary to Dr. Feingold's assertion, however, we are satisfied that the district court's instructions *did* require the jury to find that he intentionally acted outside the usual course of professional practice. Although the district court did not explicitly use the word "intent" in instructing the jury on this aspect of the offense — that the defendant "prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice" — the instructions as a whole made clear that the jury had to make a finding about Dr. Feingold's state of mind. *See United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000) ("A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").

**[5]** In its supplemental instructions, the district court informed the jury that a practitioner "may not be convicted of unlawful distribution of controlled substances when he distributes controlled substances *in good faith* to patients in the regular course of professional practice." These supplemental instructions further stated that "[a] controlled substance is distributed by a practitioner in the usual course of his professional practice if the substance is distributed by him *in good faith in medically treating a patient*." The district court explained that good faith "involves *his sincerity* in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in the country." Finally, the district court instructed that "*good faith in this context means an honest effort* to prescribe for a patient's condition." The supplemental instructions made no fewer than four references to Dr. Feingold's state of mind, all of them in connection with instructions regarding the professional competence of a licensed practitioner. Admittedly, the instructions

would have been clearer if they had stated that "the government must prove beyond a reasonable doubt that the defendant *intentionally* prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice." Nonetheless, viewed in their entirety, the instructions compelled the jury to consider whether Dr. Feingold intended to distribute the controlled substances for a legitimate medical purpose and whether he intended to act within the usual course of professional practice. The verdict represents the jury's conclusion that he did not. We therefore find no error in the jury instructions regarding Dr. Feingold's criminal intent.

## B.

Dr. Feingold also claims that the jury instructions were erroneous because they misrepresented the standard for criminal liability. Specifically, he argues that the instructions conflated the higher standard for criminal liability under § 841(a) — whether a practitioner's actions "fall outside the usual course of professional practice," *Moore*, 423 U.S. at 124 — with the standard for civil malpractice. As noted above, the district court instructed the jury that Dr. Feingold had to make "an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country." Similarly, the court instructed that good faith "involves [Dr. Feingold's] sincerity in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in the country." Dr. Feingold argues that, by using the professional "standard of care" as a benchmark in the jury instructions, the district court allowed the jury to convict simply upon finding that he had been a negligent doctor.

Initially, we reiterate that the district court's instructions required a finding of intent, not merely a finding of malpractice. Thus, while it is true that the district court's instructions referred to a national standard of care, at a minimum the

instructions required the jury to find that Dr. Feingold had *intentionally* violated that standard. Dr. Feingold's appeal thus presents the question of whether a practitioner's conviction under 21 U.S.C. § 841(a) is valid if it rests only on a finding of intentional malpractice, or whether a jury must find that the doctor intentionally engaged in even more egregious conduct. Similarly stated: can a defendant who intentionally exceeds a generally recognized "standard of medical practice" still be engaged in "the usual course of professional practice," *Moore*, 423 U.S. at 124, such that he could escape criminal liability? The question is a difficult and important one, and it implicates the conduct of any health care professional whose judgment about the appropriate standard of medical care may conflict with what a jury determines to be the generally accepted standard. The threat, Dr. Feingold argues, is that doctors could be prosecuted and perhaps convicted as criminals whenever the Attorney General disapproves of a course of treatment, or whenever they step outside of conventional medical protocols in order to provide some sort of special treatment for uniquely needy patients.

**[6]** Significantly, both the Supreme Court and this Circuit have previously approved jury instructions that refer to a national standard of care. In *Moore*, for example, the Supreme Court implicitly approved instructions that had required the jury to find that the practitioner had prescribed controlled substances "other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." 423 U.S. at 139. In *Boettjer*, we upheld a conviction where the district court had required the jury to find that the practitioner had acted "other than in good faith for a legitimate medical purpose and in accordance with the medical standards generally recognized and accepted in the medical profession." 569 F.2d at 1081. And in *United States v. Hayes*, 794 F.2d 1348 (9th Cir. 1986), we upheld a conviction obtained after the district court had instructed the jury to find that the defendant had acted in good faith, which

it defined, as did the district court in this case, to mean that the practitioner had made "an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country." *Id.* at 1351. These cases thus suggest that it is proper to instruct a jury that it may compare the defendant's conduct to an applicable standard of care.

Yet these cases have also cautioned that a district court may impermissibly lower the standard for criminal liability by instructing the jury to determine whether a practitioner-defendant has complied, or attempted to comply, with the standard of care. Indeed, a careful reading of these cases reveals that we have previously expressed concern about instructions related to the standard of care. In *Hayes*, we observed that the district court's reference to the standard of medical care was potentially confusing and that "more precise language could have been used." *Id.* at 1352. We nonetheless affirmed the practitioner's conviction because, after viewing the jury instructions in their entirety, "we fail[ed] to see how the jury could [have] interpret[ed] the instructions as permitting a finding of guilt based on mere negligence." *Id.* Likewise, in *Boettjer*, we observed that the jury instructions were subject to several possible interpretations. We noted that one plausible interpretation of the instructions would have permitted conviction "merely upon a showing of malpractice," and we held that "to the extent the given instruction countenanced this result, it was deficient." 569 F.2d at 1082. We stated in *Boettjer* that "we would not hold forth the charge given in this case as a model for emulation, nor would we encourage its verbatim proliferation." *Id.* at 1083. Finally, the Supreme Court in *Moore* was careful to emphasize that the defendant in that case had so wantonly ignored the basic protocols of the medical profession that "he acted as a large-scale 'pusher' — not as a physician." 423 U.S. at 143. The Court further described § 841(a) as prohibiting "the significantly greater offense of acting as a drug 'pusher.'" *Id.* at 138. These statements suggest that the *Moore* Court based its decision not

merely on the fact that the doctor had committed malpractice, or even intentional malpractice, but rather on the fact that his actions completely betrayed any semblance of legitimate medical treatment.

[7] We hold that an instruction is improper if it allows a jury to convict a licensed practitioner under § 841(a) solely on a finding that he has committed malpractice, intentional or otherwise. Rather, the district court must ensure that the benchmark for criminal liability is the higher showing that the practitioner intentionally has distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

Our holding is supported by the Supreme Court's decision in *Moore*, which implicitly approved an instruction that required the jury to find "beyond a reasonable doubt that a physician, who knowingly or intentionally, did dispense or distribute [methadone] by prescription, did so other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." *Moore*, 423 U.S. at 138-39 (alterations in original). The district court's instruction in *Moore* indicates that the jury could convict under § 841(a) if the government proved that the practitioner intentionally prescribed drugs for no legitimate medical purpose. Conversely, to avoid conviction, the practitioner could have demonstrated *either* that he had complied with a generally recognized standard of care *or* that he had prescribed the drugs in good faith for a legitimate medical purpose. Our reading of the jury instructions approved by the *Moore* Court, which unquestionably imposed a higher burden on the government than proving deliberate malpractice, is also in accord with the federal regulations governing licensed practitioners. *See* 21 C.F.R. § 1306.04.

[8] Moreover, our holding is consistent with the law in several of our sister circuits, which have emphasized that the

standard for criminal liability under § 841(a) requires more than proof of a doctor's intentional failure to adhere to the standard of care. *See United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994) (noting that a criminal conviction "requires more" than a showing of malpractice, and defining the standard as "proof beyond a reasonable doubt that the doctor was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, *i.e.* the personal profit of the physician"); *United States v. Stump*, 735 F.2d 273, 276 (7th Cir. 1984) (holding that evidence was sufficient to support a conviction where the doctor's pattern of prescribing drugs "could not possibly be consistent with legitimate medical treatment"); *United States v. Bartee*, 479 F.2d 484, 489 (10th Cir. 1973) (holding that evidence was sufficient to support a conviction where the doctor "was not acting for a legitimate medical purpose"). Instead, a jury must find that a doctor has intentionally prescribed controlled substances for no legitimate medical purpose. A practitioner becomes a criminal not when he is a *bad* or *negligent* physician, but when he ceases to be a physician *at all*.[2]

---

[2]We do not suggest that the federal government lacks authority to circumscribe the scope of treatment that might plausibly be considered within "the usual course of professional practice." Where the federal government has legitimately and expressly limited the ways in which practitioners may employ controlled substances, a practitioner may be prosecuted for exceeding such federal restrictions. *See Moore*, 423 U.S. at 144 (noting explicit congressional authorization for the then-secretary of Health, Education, and Welfare to define the boundaries of permissible experimentation with controlled substances for the purpose of treating drug addiction). Here, we express no opinion on the validity of any federal effort to define what constitutes a legitimate medical practice with respect to the treatment of pain with opioid drugs. *See Gonzales v. Oregon*, 126 S. Ct. 904, 925 (2005) (holding that the Attorney General lacked authority to declare illegitimate a medical standard for care and treatment of terminally ill patients that was specifically authorized under state law).

**[9]** Nonetheless, we reaffirm that it is appropriate in cases such as this for the jury to consider the practitioner's behavior against the benchmark of acceptable and accepted medical practice. Just how that benchmark is expressed to the jury — here, the district court defined that benchmark in terms of the "standard of medical practice generally recognized and accepted in the country" — is a matter within the district court's discretion.[3] *See United States v. Franklin*, 321 F.3d 1231, 1240-41 (9th Cir. 2003) ("We review for abuse of discretion a district court's formulation of jury instructions, considering 'the instructions as a whole, and in context.' " (quoting *United States v. Stapleton*, 293 F.3d 1111, 1114 (9th Cir. 2002))). We emphasize, however, that a district court may mislead a jury if its instructions referring to an applicable standard of care suggest that a breach of that standard alone is sufficient to sustain a criminal conviction.

**[10]** In this case, the instructions adequately stated the standard for criminal liability. Although the district court's references to the standard of care could have been articulated more

---

[3]The Supreme Court's decision in *Moore* authorized prosecution of licensed practitioners who act "outside the usual course of professional practice." 423 U.S. at 124. The term "professional practice" implies at least that there exists a reputable group of people in the medical profession who agree that a given approach to prescribing controlled substances is consistent with legitimate medical treatment. *Accord* 21 C.F.R. § 1306.04 (requiring prescriptions to be "issued for a legitimate medical purpose"). As the Fifth Circuit has stated, "[o]ne person's treatment methods do not alone constitute medical practice." *United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir. 1986). Although the district court's benchmark of a "standard of medical practice generally recognized and accepted in the country" may be overly broad given the diversity of views that may exist within the medical profession about the propriety of any given course of medical treatment, we nonetheless consider the instruction appropriate in light of the court's other instructions that Dr. Feingold could not be convicted if he distributed the controlled substances "in good faith in medically treating a patient" or distributed them for a "legitimate medical purpose." *See United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000) ("A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").

clearly, the instructions informed the jury that "[a] practitioner may not be convicted of unlawful distribution of controlled substances when he distributes controlled substances in good faith to patients in the regular course of professional practice." Moreover, in its description of the elements, the district court instructed the jury that "the government must prove beyond a reasonable doubt that the defendant prescribed or distributed the controlled substance other than for a legitimate medical purpose and not in the usual course of professional practice." These instructions correctly articulated the standard for criminal liability under § 841(a).

Further, in this case, as in *Moore*, *Boettjer*, and *Hayes*, any imprecision in the jury instructions as to the standard for criminal liability was harmless beyond a reasonable doubt. *See, e.g.*, *Rose v. Clark*, 478 U.S. 570, 579-80 (1986) (conducting harmless error review of an instruction that misstated an element of the charged crime); *United States v. Rubio-Villareal*, 967 F.2d 294, 296 n.3 (9th Cir. 1992) (en banc) (same). The evidence against Dr. Feingold was overwhelming. He prescribed drugs to people whom he knew to be addicts, to people whom he had never examined, to people whom he had never met, and to undercover law enforcement officials who did little more than tell him they wanted narcotics. He continued to prescribe Schedule II narcotics even after the state of Arizona had made it illegal for naturopathic physicians to do so, and after local pharmacists had specifically refused to fill some of his prescriptions because he lacked authorization to write them. Further, he dispensed drugs in quantities that, according to the government's experts, probably would have killed his patients, and certainly would have destroyed their livers, if they had actually consumed the drugs in the amounts he prescribed.

[11] Moreover, Dr. Feingold repeatedly *admitted* during his testimony that his practice of prescribing controlled substances was "outside the course of professional practice." His defense at trial was not that he earnestly adhered to some

alternative, but nonetheless medically legitimate standard of care; rather, he claimed that he was an incompetent doctor who was honestly trying to help his patients manage pain, didn't know that they were abusing the drugs due to his lack of training about the use of opioids, and never *intended* to flout professional protocol. Dr. Feingold's jury rejected this argument, just as the jury did in *Moore*. *See* 423 U.S. at 143 (noting that the jury disbelieved the practitioner's defense that he was "experimenting with a new . . . theory of detoxification"). On this record, we hold that any reasonable jury would have found that Dr. Feingold intentionally acted outside the usual course of professional practice. We therefore affirm his convictions.

## IV.

Dr. Feingold raises several objections to his 144-month sentence. First, he argues that the district court calculated his offense level under the then-mandatory sentencing guidelines based on judge-found facts, in violation of the Sixth Amendment. *See United States v. Booker*, 543 U.S. 220, 244 (2005). Second, he argues that the district court improperly denied his request for a two-point reduction in his offense level pursuant to U.S.S.G. § 2D1.1(b)(7). Finally, he argues that he is entitled to resentencing because his sentence was imposed under the district court's erroneous assumption that the sentencing guidelines were mandatory. *See United States v. Beng-Salazar*, No. 04-50518 (9th Cir. July 6, 2006).

[12] We reject Dr. Feingold's argument that his sentence is the product of constitutional error. At sentencing, the district court imposed two sentence enhancements — one because Dr. Feingold abused a position of public trust, *see* U.S.S.G. § 3B1.3, and the other because of the amount of drugs he illegally distributed, *see* U.S.S.G. § 2D1.1(c)(5). Both of these enhancements were based on facts that were admitted by the defendant and implicit in the jury's verdict. The first increase in Dr. Feingold's offense level was based on his admission

that he distributed the drugs in question under the aegis of being a licensed naturopathic physician. *See United States v. Barnes*, 125 F.3d 1287, 1292 (9th Cir. 1997) ("[A]buse of the fundamental trust between doctor and patient is precisely the sort of behavior to which section 3B1.3 is directed."). The second enhancement was properly based on Dr. Feingold's admission at trial that he actually prescribed the quantities of drugs alleged in the indictment. *See United States v. Labrada-Bustamante*, 428 F.3d 1252, 1261 (9th Cir. 2005). Thus, as the district court found, because Dr. Feingold admitted the facts necessary to calculate his sentence enhancements, there was no Sixth Amendment violation. *Booker*, 543 U.S. at 244 (reiterating that the Sixth Amendment does not preclude the imposition of additional punishment on the basis of facts "admitted by the defendant"); *see also United States v. George*, 420 F.3d 991, 1001 (9th Cir. 2005). No remand is necessary on constitutional grounds.

**[13]** We also reject Dr. Feingold's argument that the district court erroneously denied his request for a reduction in his offense level under U.S.S.G. § 2D1.1(b)(7), which was then codified under subsection (b)(6). That guidelines provision — which incorporates by reference the criteria set forth in the so-called "safety valve" provision of the guidelines, *see* U.S.S.G. § 5C1.2(a) — provides for a two-point reduction in the offense level of defendants who meet certain requirements (non-violent offender, first-time offense, low-level participant, etc.). Dr. Feingold argues, and the government concedes, that the district court was mistaken when it held that he was ineligible for the reduction because his offenses did not carry a mandatory minimum. We agree, and we join our sister circuits in observing that a two-point reduction under this provision is available to criminal defendants regardless of whether their offense carries a mandatory minimum. *See, e.g.*, *United States v. Osei*, 107 F.3d 101, 104-05 (2d Cir. 1997); *United States v. Warnick*, 287 F.3d 299, 304 (4th Cir. 2002); *United States v. Leonard*, 157 F.3d 343, 345-46 (5th Cir. 1998); *United States v. Mashek*, 406 F.3d 1012, 1018-20 (8th

Cir. 2005); *United States v. Mertilus*, 111 F.3d 870, 873-74 (11th Cir. 1997); *United States v. Plunkett*, 125 F.3d 873, 874 (D.C. Cir. 1997); *see also* U.S.S.G. § 2D1.1 cmt. 21 ("The applicability of [the reduction] shall be determined without regard to whether the defendant was convicted of an offense that subjects the defendant to a mandatory minimum term of imprisonment.").

**[14]** The district court, however, also cited an alternative basis for its decision. Specifically, it found that the reduction was "not . . . applicable in this case" because Dr. Feingold had not met the last criterion for the reduction, in that he had not "truthfully provided to the government all the information he has concerning the offense." U.S.S.G. § 5C1.2(a)(5). We hold that this factual determination by the district court was not clearly erroneous. *See United States v. Cantrell*, 433 F.3d 1269, 1280, 1283 (9th Cir. 2006) (holding that "review of the district court's application of the Guidelines is the same as it was under the pre-*Booker* sentencing regime"); *United States v. Ajugwo*, 82 F.3d 925, 929 (9th Cir. 1996) (noting that the factual determinations relating to a defendant's eligibility for the safety valve are reviewed for clear error). Because this determination provided an independent basis for the district court's decision to deny the two-point reduction, any error in the district court's original ruling regarding the lack of a mandatory minimum was harmless.

**[15]** Finally, we hold that Dr. Feingold is entitled to resentencing under *United States v. Beng-Salazar*. *See* Slip op. at 7491-94 (holding that "a defendant who raised an objection in district court based on the Sixth Amendment holdings of the *Apprendi* line of cases preserved his claim that he is entitled to resentencing under the advisory Guidelines regime"). The government argues that remand for resentencing is not necessary because the district court provided a lengthy sentencing memorandum setting forth in detail the reasons for the sentence it imposed. That ruling, however, provides no indication of what the district court would have done if it had known that

the guidelines were advisory. *See id.* at 7493. Full resentencing is therefore warranted.

For the foregoing reasons, we **AFFIRM** Dr. Feingold's convictions, we **VACATE** his sentence, and we **REMAND** for resentencing pursuant to *Beng-Salazar*.