**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 16, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

STEPHEN J. SCHNEIDER; LINDA
K. SCHNEIDER, a/k/a Linda K.
Atterbury,

     Defendants - Appellants.

No. 10-3281

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 6:07-CR-10234-MLB-1&2)**

---

John T. Carlson, Assistant Federal Public Defender, and Robert T. Fishman, Of Counsel, Ridley, McGreevy & Winocur, P.C. (and Raymond P. Moore, Federal Public Defender, on the briefs), Denver, Colorado, for Defendants - Appellants.

Tanya Treadway, Assistant United States Attorney, (and Barry R. Grissom, United States Attorney, on the briefs), Topeka, Kansas, for Plaintiff - Appellee.

---

Before **KELLY** and **HOLMES**, Circuit Judges and **MARTINEZ**[*], District Judge.

---

**KELLY**, Circuit Judge.

---

[*]The Honorable William J. Martinez, United States District Judge, District of Colorado, sitting by designation.

Defendants-Appellants Dr. Stephen and Linda Schneider (the Schneiders) were convicted of several counts of unlawful drug distribution, health care fraud, and money laundering, all arising from their operation of Schneider Medical Clinic. The district court sentenced Dr. Schneider to 360 months' imprisonment, and Ms. Schneider to 396 months' imprisonment. The Schneiders appeal their convictions, alleging that (1) they were denied the right to conflict-free representation; (2) the district court erroneously admitted expert testimony; (3) the district court improperly instructed the jury; and (4) there was insufficient evidence to support the charge of health care fraud resulting in death. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Background

This is the second time that the Schneiders and their medical clinic come before us on appeal. On the first occasion, we considered, on interlocutory appeal by the government, whether a pre-trial order excluding evidence and limiting the government's time to present its case was proper. United States v. Schneider, 594 F.3d 1219 (10th Cir. 2010). We held that it was not, vacated the district court order, and remanded for trial. Id. at 1221. In the same decision, we dismissed the Schneiders' cross-appeal from the denial of their motion to exclude the government's expert testimony, finding that we lacked jurisdiction under the

collateral order doctrine. Id. at 1229–30. The Schneiders now appeal their convictions. As before, we begin with the relevant facts.

Dr. Schneider was a doctor of osteopathic medicine and his wife, Ms. Schneider, was a licensed practical nurse. IV R. 104. They owned and operated Schneider Medical Clinic in Haysville, Kansas, where they provided pain management treatment including the prescription of controlled substances. Id. at 104–05. On May 3, 2010, a Kansas grand jury issued a third superseding indictment charging: Count 1—conspiracy to unlawfully distribute drugs, commit health care fraud, engage in money laundering, and defraud the United States in violation of 18 U.S.C. § 371; Counts 2–6—unlawful drug distribution and unlawful drug distribution resulting in death in violation of 21 U.S.C. § 841(a)(1); Counts 7–17—health care fraud and health care fraud resulting in death in violation of 18 U.S.C. § 1347; and Counts 18–34—money laundering in violation of 18 U.S.C. § 1957. Id. at 104–72.

By the time of the third indictment, much had already happened in the case, especially with respect to the Schneiders' trial counsel. The Schneiders, after befriending Siobhan Reynolds, a leader of the Pain Relief Network (PRN), fired their court-appointed counsel and hired new counsel that Ms. Reynolds suggested. VIII R. 104. Dr. and Ms. Schneider had separate counsel, but their attorneys were in communication with Ms. Reynolds. See id. at 181, 235–36. Moreover, while representing Dr. and Ms. Schneider, this counsel, on behalf of the PRN, sought

temporary restraining orders prohibiting the Kansas Board of Healing Arts from suspending Dr. Schneider's medical license. Id. at 106–07. This same counsel also filed a lawsuit in the Eastern District of Washington challenging state rules restricting access to pain medicines. Id. at 263–73.

Aware of a potential conflict, the government moved for a determination of conflict. Id. at 143. On March 14, 2008, then presiding Judge Brown held a hearing on the motion. Id. at 142–43. Judge Brown stated the government's concerns, and defense counsel represented that there was no conflict. Id. at 144–64. Then, after conferring with counsel, Dr. and Ms. Schneider waived all potential conflicts. Id. In November 2009, the government renewed its motion for a determination of a conflict. Id. at 99. Judge Belot, who presided at trial, conducted ex parte hearings for Dr. and Ms. Schneider on January 11, 2010. XV R. 160–68, 173–86. At each hearing, Judge Belot questioned the Schneiders about the potential conflicts. Id. Both stated that they were aware of no conflict and waived all potential conflicts. Id. at 168, 185.

During Spring 2010, the case proceeded to trial. The government presented an extensive amount of evidence detailing the operations of Schneider Medical Clinic. This included lay testimony from patients and former employees, along with expert testimony from medical experts. On appeal, the Schneiders challenge portions of this expert testimony. Aplt. Stephen (S.) Br. 17–32. Thus, we describe this expert testimony in more detail.

At trial, Dr. Theodore Parran was the government's expert on the patient care at Schneider Medical Clinic. XIII R. 2957. Dr. Parran reviewed over 100 patient records. Id. From those records, Dr. Parran concluded that the Schneiders violated Kansas standards for prescribing controlled substances. Id. at 3002–03. According to Dr. Parran, the Schneiders: (1) ran a practice that attracted drug addicts; (2) took inadequate medical histories; and (3) indiscriminately prescribed controlled drugs in excessive and escalating amounts. Id. at 3003, 3008, 3028. On cross-examination, defense counsel questioned Dr. Parran about how the clinic operated. Id. at 3473–76. The government, on redirect, asked Dr. Parran additional questions regarding operations of the clinic, to which he replied that "the clinic was at fault" for illegal drug distribution. Id. at 3527. Dr. Parran also testified that, from his review of the records, the Schneiders ran a "dishonest practice." Id. at 2982–83. The Schneiders object to this testimony.

Dr. Douglas Jorgensen was the government's expert on pain management and billing practices at Schneider Medical Clinic. XIV R. 404. Dr. Jorgensen reviewed fifty-four medical charts, numerous autopsy and toxicology reports, and information about billing and coding practices. Id. As part of his extensive testimony on his observations from these documents, Dr. Jorgensen summarily opined that the Schneiders' health care fraud resulted in patients' deaths. See, e.g., id. at 520, 526. Dr. Jorgensen also testified that he believed, again from his review of the records, that the Schneiders filed fraudulent claims. Id. at 519. The

- 5 -

Schneiders object to this testimony.

Dr. Graves Thorne Owen also testified as an expert in pain management. XIII R. 2785, 2788. The government asked Dr. Owen, from a review of the medical records, whether Dr. Schneider "was prescribing controlled substances for a legitimate medical purpose?" Id. at 2809, 2819. Dr. Owen answered that "[i]t was not." Id. The Schneiders object to this testimony, along with similar testimony from Drs. Parran and Jorgensen.

After a lengthy trial, the jury found Dr. Schneider guilty of Counts 1–17 and two money laundering charges (Counts 26 and 28), and found Ms. Schneider guilty of all charges save two money laundering charges (Counts 23 and 24). The court sentenced Dr. Schneider to 360 months' imprisonment, and Ms. Schneider to 396 months' imprisonment. The Schneiders timely appealed, filing separate briefs but incorporating by reference the arguments made in each other's briefs. See Fed. R. App. P. 28(i); Aplt. S. Br. 9; Aplt. Linda (L.) Br. 75. Ms. Schneider, however, does not join Dr. Schneider's challenge to Instruction 33. Statement Joining Co-Def.'s Br. and Notice of Errata, Sept. 4, 2012.

Discussion

A. Right to Conflict-Free Representation

The Schneiders first argue that they were denied the right to conflict-free representation. Aplt. L. Br. 36. They allege that the district court's advice of the

potential conflict and their subsequent waivers were inadequate. Id. They contend that this is a conflict-of-interest claim, not a deficient-performance claim, and thus, this court should apply the adverse-effects test of Cuyler v. Sullivan, 446 U.S. 335 (1980), not the prejudice test of Strickland v. Washington, 446 U.S. 668 (1984). Aplt. L. Br. 57. Under Culyer, a defendant need only prove an actual conflict of interest that adversely affected counsel's performance. 446 U.S. at 350. The government disagrees, arguing that (1) the Schneiders waived the right to conflict-free representation, and (2) this is a garden-variety, ineffective assistance of counsel claim best reviewed in a collateral proceeding under Strickland. Aplee. L. Br. 22–23.

We agree with the government that the Schneiders waived the right to conflict-free representation. The Sixth Amendment right to counsel contemplates the right to conflict-free representation. See Holloway v. Arkansas, 435 U.S. 475, 483–84 (1978). However, a defendant may waive this right, if it is done voluntarily, knowingly, and intelligently. Estelle v. Smith, 451 U.S. 454, 471 n.16 (1981). The trial court must ensure that a defendant understands the nature of any conflict and its potential effect on counsel's representation. See Wheat v. United States, 486 U.S. 153, 161 (1988). We have held that

> in order for a defendant effectively to waive his right to conflict-free counsel, the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with

- 7 -

the challenged counsel.

United States v. Migliaccio, 34 F.3d 1517, 1527 (10th Cir. 1994) (quotation omitted).  Moreover, when determining if a waiver is valid, we consider the "totality of the circumstances," including all prior discussions of any conflict.  Id.

Here, the record shows that the Schneiders, two medical professionals, waived their right to conflict-free representation.  Prior to trial, the court conducted two hearings on potential conflicts.  At the first hearing, Judge Brown stated the government's concerns, counsel represented that there was no conflict, and then, after given the opportunity to confer with counsel, the Schneiders waived all potential conflicts.  VIII R. 144–64.  At the second hearing, which was conducted ex parte and separately for Dr. and Ms. Schneider, Judge Belot again questioned the Schneiders about the potential conflict.  XV R. 160–68, 173–86.  Both stated they were aware of no conflict and waived all potential conflicts.  Id. at 168, 185.  Considering the "totality of the circumstances," Migliaccio, 34 F.3d at 1527, we have no doubt that the waivers were valid.

We also agree with the government that any remaining claim is best brought in a collateral proceeding.  We have long explained that "ineffective assistance of counsel claims are more appropriate for collateral attack under 28 U.S.C. § 2255 than direct appeal, because the factual record for such claims is more developed when the district court conducts an evidentiary hearing on the issue."  United States v. Bergman, 599 F.3d 1142, 1149 (10th Cir. 2010) (citation

omitted).  Here, further development of the record is required.  Thus, any ineffective assistance claim should be brought in a collateral proceeding.

Finally, we note that Dr. and Ms. Schneider criticize the government for taking inconsistent positions on the issue of conflict.  The Schneiders even suggest that judicial estoppel is appropriate because the government, at trial, argued there was a conflict, and now, on appeal, denies the existence of a conflict.  Aplt. L. R. Br. 1–6; Aplt. S. R. Br. 5–8.  We reject this suggestion, and remind the Schneiders that the government has a "duty to alert the court to defense counsel's *potential* and actual conflicts of interest."  United States v. McKeighan, 685 F.3d 956, 966 (10th Cir. 2012) (emphasis added).  This responsibility, however, does not prevent the government from later denying the existence of a conflict.

B.    Expert Witness Testimony

The Schneiders next contend that the district court improperly allowed expert witnesses to testify (1) that Dr. Schneider was guilty of the crimes charged; (2) as to legal opinions; and (3) about Dr. Schneider's state of mind.  Aplt. S. Br. 17.  We review a district court's admission of expert testimony for abuse of discretion, United States v. Shaffer, 472 F.3d 1219, 1225 (10th Cir. 2007), and will only reverse when that decision is "manifestly erroneous."  United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005).  When a claim is not preserved, we review for plain error.  United States v. Knight, 659 F.3d 1285,

1287 (10th Cir. 2011). Under plain error review, we may not reverse unless we find an (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.

The Schneiders first allege the court erred by admitting testimony that Dr. Schneider was guilty of unlawful drug distribution in violation of 21 U.S.C. § 841 and health care fraud in violation of 18 U.S.C. § 1347. Aplt. S. Br. 20–22. Specifically, the Schneiders argue that it was improper for Dr. Parran to opine that "the clinic was at fault" for illegal drug distribution, and for Dr. Jorgensen to opine that Dr. Schneider "engaged in health care fraud" resulting in death. Id. at 20–21. The Schneiders did not object to Dr. Jorgensen's testimony, so we review that claim for plain error.

The rules of evidence allow an expert to opine on an "ultimate issue" to be decided by the trier of fact. Fed. R. Evid. 704(a); Dazey, 403 F.3d at 1171. However, an expert may not "simply tell the jury what result it should reach[;]" he or she must explain the basis for any summary opinion. Dazey, 403 F.3d at 1171. Here, we find no error in the admission of Drs. Parran and Jorgensen's testimony. Neither doctor told the jury to reach a particular verdict, i.e. that Dr. Schneider was guilty. Rather, after explaining at great length their observations from the evidence, they summarized their findings in the testimony above. XIII R. 2945–3320; XIV R. 395–550. As such, the testimony was properly admitted.

The Schneiders next argue that expert witnesses impermissibly offered legal conclusions that Dr. Schneider engaged in conduct outside the ordinary course of medical practice. Aplt. S. Br. 23–28. Here, the Schneiders cite the testimony of Drs. Owens, Jorgensen, and Parran, each opining that Dr. Schneider prescribed controlled substances "for other than legitimate medical purposes." Id. at 23–26. The Schneiders moved in limine to exclude this testimony, and the judge denied the motion; thus, we review for abuse of discretion. See United States v. Mejia-Alarcon, 995 F.2d 982, 986 (10th Cir. 1993).

The crux of the Schneiders' argument is that the experts should not have used a legal phrase—other than legitimate medical purposes—in their testimony. However, we allow experts to refer "to the law in expressing [their] opinion." United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008) (internal quotation marks and citation omitted). The concern, rather, is when an expert uses a specialized legal term and usurps the jury's function. The use of the phrase "other than legitimate medical purposes" does not cause such a problem. See United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006). The Schneiders' effort to distinguish the permissible testimony in McIver from what occurred here is not persuasive. Therefore, the admission of the testimony was proper.

The Schneiders finally argue that the experts impermissibly testified to Dr. Schneider's intent. Aplt. S. Br. 28. Here, the Schneiders cite testimony from Dr. Jorgensen that the documents evidence "an intention to deceive and defraud the

system," and from Dr. Parran that "this is a dishonest practice." Id. at 29. The Schneiders did not object at trial, so we review for plain error.

The evidence rules prohibit an "expert witness . . . [from] stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b); see Shaffer, 472 F.3d at 1225. However, the rules do not prevent an expert from drawing conclusions about intent, so long as the expert does not profess to know a defendant's intent. See United States v. Orr, 68 F.3d 1247, 1252 (10th Cir. 1995). In this case, the expert witnesses expressly disclaimed knowledge of Dr. Schneider's intent. See, e.g., XIV R. 533–34 ("Q: Are you telling the jury what you know to be the Defendant's intent or are you stating what the evidence indicates to you? A: I'm stating what the evidence indicates to me . . . ."). Thus, we find no error in the admission of this testimony.

C.     Erroneous Jury Instructions

The Schneiders next contend that the trial court, in charging the jury, erred in four ways. First, they contend that the court should have instructed that, to convict under 21 U.S.C. § 841(a)(1), the jury had to find that Dr. Schneider knowingly acted without a legitimate medical purpose or outside the usual course of professional practice. Aplt. S. Br. 32. Second, they claim that it was error to include the phrase "beyond the bounds of medical practice" in the drug distribution instruction. Id. at 41–42. Third, they contend that the good faith

instruction was erroneous because it prevented the jury from finding Dr. Schneider acted in good faith.  Id. at 45.  And fourth, they argue that the health care fraud instruction was erroneous because it allowed Dr. Schneider to be convicted if Ms. Schneider was found guilty.  Id. at 53.

We review a court's rejection of a proposed jury instruction for abuse of direction, considering de novo the instructions as a whole to determine whether they accurately inform the jury of the governing law.  United States v. Gwathney, 465 F.3d 1133, 1142 (10th Cir. 2006).  When a party does not object, we review for plain error.  United States v. Teague, 443 F.3d 1310, 1314 (10th Cir. 2006).  The Schneiders objected to the court's refusal to give its proposed instruction under § 841(a)(1), but did not object to the other instructions.

The Schneiders first challenge the unlawful drug distribution instruction, stating that the court should have instructed the jury that the government must prove Dr. Schneider knowingly and intentionally acted either not for a legitimate medical purpose or outside the usual course of his professional practice.  Aplt. S. Br. 34.  The instruction, as given, provided that the jury must find:

First:    Stephen Schneider dispensed [controlled substances] . . .;

Second:   Stephen Schneider acted knowingly and intentionally; and

Third:    Stephen Schneider's actions were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of medical practice.

IV R. 839.  The court also provided a good faith instruction that:

- 13 -

> [A] physician does not violate Section 841(a)(1) . . . when he dispenses a controlled substance in good faith to a patient in the usual course of professional practice.
>
> The term "good faith" means the honest exercise of good professional judgment as to a patient's medical needs.

IV R. 845. In support, the Schneiders cite United States v. Feingold, where the Ninth Circuit held that, to convict under § 841(a)(1), a "jury must make a finding of intent not merely with respect to distribution, but also with respect to the doctor's intent to act as a pusher rather than a medical professional." 454 F.3d 1001, 1008 (9th Cir. 2006). However, Feingold provides little support because the instructions in Feingold were nearly identical to those in the instant case, and the court in Feingold held that the instructions "compelled the jury to consider whether [the defendant] intended to distribute the controlled substances for a legitimate medical purpose and whether he intended to act within the usual course of professional practice." 454 F.3d at 1009. We think the same is true here—the jury considered Dr. Schneider's intent. In other words, Dr. Schneider's argument is without merit because the jury, on the instructions given, found that he knowingly acted not for a legitimate medical purpose or not within the usual course of professional practice. See IV R. 839, 845. In reaching this conclusion, we need not decide any *mens rea* requirement under § 841(a)(1); we only hold that the Schneiders' challenge is without merit.

On the Schneiders' second claim concerning the jury instructions, we do

not believe that the inclusion of the phrase "beyond the bounds of medical practice" was plain error. Counts 2–6 charged unlawful drug distribution in violation of § 841(a)(1). IV R. 835. Instructions 20–23 and 26 provided that to find Dr. Schneider guilty the jury needed to find that his actions "were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of medical practice." Id. at 838–41, 844. As an initial matter, we reject the Schneiders' claim that there is no precedential support for the phrase "beyond the bounds of medical practice." See United States v. Moore, 423 U.S. 122, 140 (1975) (discussing physicians who "operate beyond the bounds of professional practice"). More directly, we find no practical difference between "not . . . in the usual course of professional medical practice" and "beyond the bounds of medical practice." Finally, if there were a difference, overwhelming evidence proved that Dr. Schneider unlawfully prescribed controlled substances. Thus, the inclusion of the phrase "beyond the bounds of medical practice" did not affect the Schneiders' substantial rights.

We similarly find no error in the court's good faith instruction. Instruction 27 provided that "a physician does not violate Section 841(a)(1) . . . when he dispenses a controlled substance in good faith to a patient in the usual course of professional practice." IV R. 845. The Schneiders contest the phrase "in the usual course of professional practice," arguing that a jury could only find Dr. Schneider acted in good faith if they first found his actions to be in the usual

- 15 -

course of professional practice. Aplt. S. Br. 47. This reading, however, parses the instruction too finely. Instruction 27 later defines "good faith" as "the honest exercise of good professional judgment." IV R. 845. Thus, the jury could have decided that Dr. Schneider acted in "good faith."

Finally, we find no error in the court's health care fraud instruction. Instruction 33 provided that "[t]o find one or both of the defendants guilty of health care fraud [you must find] a defendant knowingly and willfully executed . . . a scheme or artifice to defraud a health care benefit program." Id. at 852. Dr. Schneider argues that this instruction permitted the jury to convict him on a strict liability theory—i.e. if Ms. Schneider (a defendant) executed a health care fraud, Dr. Schneider (one or both of the defendants) would be guilty as well. Aplt. Br. S. 56. We reject this claim, noting that even if this instruction could have been better worded, the instructions, when considered as a whole, correctly informed the jury that they needed to consider intent and guilt separately. See IV R. 820. Moreover, the jury completed separate verdict sheets for Dr. and Ms. Schneider and convicted them of different offenses. See id. at 770–83. We do not believe this instruction was erroneous.

D.    18 U.S.C. § 1347:  Counts 7–9

Our review is de novo as to the sufficiency of the evidence. United States v. Smith, 641 F.3d 1200, 1204 (10th Cir. 2011). "We view the evidence in the light most favorable to the verdict to ascertain whether any rational trier of fact

could have found the defendant guilty beyond a reasonable doubt." Id. at 1204–05.

Section 1347(a) provides an enhanced penalty for health care fraud "if the violation results in death." 18 U.S.C. § 1347(a). Counts 7–9 charged the Schneiders with health care fraud resulting in death. IV R. 851. The Schneiders assert that the government presented insufficient evidence to support the jury's verdict. Aplt. S. Br. 52–53. Specifically, the Schneiders argue that the fraud perpetuated against insurers—i.e. upcoding services or billing for services not rendered—was not the cause of harm to any patients. The government responds that the evidence presented was similar to that upheld as sufficient in other circuits. Aplee. S. Br. 60; see United States v. Webb, 655 F.3d 1238, 1258 (11th Cir. 2011); United States v. Martinez, 588 F.3d 301, 319–23 (6th Cir. 2009).

Sufficient evidence supports the convictions on these counts. As the government explained at oral argument, evidence of the scheme to defraud was not limited to the upcoding and billing practices. Rather, the scheme included the illegal distribution of drugs, which caused the deaths of three patients—Patty, Eric, and Robin. The expert testimony and medical records produced at trial showed that Dr. Schneider continued to prescribe controlled substances to Patty, Eric, and Robin even as their conditions worsened. See XIV R. 514–36. And Dr. Schneider, with the help of Ms. Schneider, submitted false and fraudulent claims to the insurers for these services. See id. These claims were false and fraudulent

because they were not for legitimate medical services rendered.  <u>See</u> <u>id.</u> at 517.  A reasonable factfinder could conclude beyond a reasonable doubt that Dr. and Ms. Schneider's health care fraud scheme resulted in the deaths of Patty, Eric, and Robin.  Thus, we find the evidence sufficient to sustain the conviction and enhancement under § 1347.

AFFIRMED.  Appellee's motion to supplement the record on appeal is DENIED.

10-3281, <u>United States v. Schneider</u>

**HOLMES,** J., concurring, joined in Part I.C by **MARTINEZ**, J.

 I join much of the majority's opinion.  In particular, I fully join Parts A and B and the portions of Part C not visited here.  I also concur in the majority's ultimate ruling, affirming the district court's judgment.  I write separately to offer my thoughts regarding two of the Schneiders' jury-instruction challenges and their claim that there was insufficient evidence to support their convictions for health-care fraud resulting in death, pursuant to 18 U.S.C. § 1347.  I hope to bolster, and clarify the foundation for, the majority's rulings on these three matters.

**I**

**A**

 We "review a district court's decision to give a particular jury instruction for abuse of discretion," but "we review de novo legal objections to the jury instructions."  <u>Frederick v. Swift Transp. Co.</u>, 616 F.3d 1074, 1079 (10th Cir. 2010) (citations omitted) (internal quotation marks omitted); <u>see also</u> <u>Webb v. ABF Freight Sys., Inc.</u>, 155 F.3d 1230, 1248 (10th Cir. 1998) ("[W]e will find an abuse of discretion if the challenged instruction incorrectly states the governing law.").  We read and evaluate jury instructions in light of the entire record to determine if they "fairly, adequately and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them."  <u>Lederman v. Frontier Fire Prot., Inc.</u>, 685

F.3d 1151, 1154–55 (10th Cir. 2012) (quoting <u>United States v. Barrera-Gonzales</u>, 952 F.2d 1269, 1272 (10th Cir. 1992)) (internal quotation marks omitted). "We do not determine whether the instructions, on the whole, are flawless, but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to decide those issues." <u>Brodie v. Gen. Chem. Corp.</u>, 112 F.3d 440, 442 (10th Cir. 1997) (citation omitted) (internal quotation marks omitted). So long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction is not an abuse of discretion. <u>See</u> <u>United States v. Suntar Roofing, Inc.</u>, 897 F.2d 469, 473 (10th Cir. 1990).

When no objection has been made at trial, we review jury instructions for plain error. <u>See</u> <u>United States v. Sturm</u>, 673 F.3d 1274, 1281 (10th Cir. 2012). "Plain error occurs when there is (i) error, (ii) that is plain, which (iii) affects the defendant's substantial rights, and which (iv) seriously affects the fairness, integrity, or public reputation of judicial proceedings." <u>United States v. Lopez-Medina</u>, 596 F.3d 716, 738 (10th Cir. 2010) (quoting <u>United States v. Ruiz-Terrazas</u>, 477 F.3d 1196, 1199 (10th Cir. 2007)) (internal quotation marks omitted).

**B**

I address here the Schneiders' challenge to the elemental instructions for illegally dispensing a controlled substance under 18 U.S.C. § 841(a)(1). Specifically, the Schneiders contend that the district court erred in not instructing

the jury that, in order to convict the Schneiders of this offense, it had to find that Dr. Schneider dispensed controlled substances with at least knowledge that he was doing so without a legitimate medical purpose or outside of the usual course of professional practice.

**1**

The Controlled Substances Act ("CSA") provides, in relevant part: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a)(1). A physicians' exemption is found in the CSA's definitions and related regulations. To be exempted from § 841(a)(1)'s prohibitions, the physician must be registered and acting as authorized. See 21 U.S.C. §§ 802(21), 822(b). "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).[1]

---

[1]    Citing our decision in United States v. Nelson, 383 F.3d 1227 (10th Cir. 2004), the Schneiders assert that we have held that the legitimate-medical-purpose and usual-course-of-professional-practice standards are "just two different ways of saying the same thing." Aplt. Opening Br. (SJS) at 48 n.13. Actually, we have not gone that far. Although, in Nelson, we observed that there was "considerable room to doubt" whether there were material differences between the two standards worthy of advocating for, "recognizing the limits of our imagination," we were "hesitant to say that it never could make a difference" which standard applied. 383 F.3d at 1231. Although I address, as appropriate, in
(continued...)

-3-

The district court's jury instructions for the § 841 charges are found in Instructions 20–23. R., Vol. 4, at 838–41 (Jury Instructions, filed July 1, 2010). They follow the same general format:

> First: Stephen Schneider dispensed . . . controlled substances to [individual];
>
> Second: Stephen Schneider acted knowingly and intentionally; and
>
> Third: Stephen Schneider's actions were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of medical practice.
>
> In order to find Linda Schneider guilty . . . you must find that she aided and abetted Stephen Schneider.

Id. at 841 (Instruction No. 23).

The Schneiders argue that the CSA's requirement that a physician act "knowingly or intentionally" applies not only to the element of dispensing a controlled substance, but also to the requirement that such dispensing be without authorization under the CSA. In other words, the Schneiders contend that the physician must at least know that the prescription is not "issued for a legitimate medical purpose," and that the physician was not "acting in the usual course of his professional practice." See Aplt. Opening Br. (SJS) at 34.

---

[1](...continued)
discussing the Schneiders arguments, one or both of the standards, any differences between the two are not of any appreciable significance to my analysis here.

**2**

At the outset, it is helpful to clarify what issues are <u>not</u> implicated by the Schneiders' arguments. Notably, it is important to highlight that the viability of the Schneiders' arguments does not turn on whether the legitimate-medical-purpose and the usual-course-of-professional-practice standards are reflected in the express terms of 21 U.S.C. § 841(a)(1). They are not. At least in the context of this case and under the law of this circuit, the government's arguments to the contrary are misguided and off-target.

The government observes that the legitimate-medical-purpose and usual-course-of-professional-practice standards are not reflected in the express terms of 21 U.S.C. § 841(a)(1) and that these standards, taken together, constitute no more than an exemption for physicians and are not <u>elements</u> of § 841(a)(1). <u>See</u> Aplee. Br. (SJS) at 18. The government primarily employs this observation in its efforts to distinguish two key Supreme Court cases upon which the Schneiders rely—<u>Liparota v. United States</u>, 471 U.S. 419 (1985), and <u>United States v. X-Citement Video, Inc.</u>, 513 U.S. 64 (1994). <u>See</u> Aplee. Br. (SJS) at 21–22.

In those cases, drawing upon well-settled and customary interpretive principles, the Supreme Court construed two criminal statutes as embodying a <u>mens rea</u> requirement that was linked to certain substantive elements of the statutes in question. <u>See</u> <u>X-Citement Video</u>, 513 U.S. at 69 (noting "the respective presumptions that some form of scienter is <u>to be implied in a criminal</u>

statute even if not expressed, and that a statute is to be construed where fairly possible so as to avoid substantial constitutional questions" (emphasis added)); Liparota, 471 U.S. at 425 ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." (emphasis added) (quoting Morissette v. United States, 342 U.S. 246, 250 (1952)) (internal quotation marks omitted)). And that mens rea requirement that the Supreme Court discerned in the two cases—specifically, a "knowing" mens rea—had to be satisfied before the elements at issue could give rise to criminal liability. See X-Citement Video, 513 U.S. at 78 ("[W]e conclude that the term 'knowingly' in [18 U.S.C.] § 2252 extends both to the sexually explicit nature of the material and to the age of the performers."); Liparota, 471 U.S. at 425 ("Absent indication of contrary purpose in the language or legislative history of the statute, we believe that [7 U.S.C.] § 2024(b)(1) requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations.").

The government's position appears to be that, unlike the statutes at issue in Liparota and X-Citement Video, there are no express elements of § 841(a)(1) embodying the standards at issue here upon which to append a mens rea requirement and, therefore, the Schneiders' reliance on this Supreme Court

-6-

precedent is misplaced. Put another way, as the government reasons, because the legitimate-medical-purpose and usual-course-of-professional-practice standards are not express elements of § 841(a)(1), <u>Liparota</u> and <u>X-Citement Video</u> are inapposite and, more specifically, those cases do not militate in favor of a conclusion that it is the government's obligation to establish that Dr. Schneider acted at least knowingly contrary to one or both of those standards.

The government's argument, however, is misguided and off the mark for at least two reasons. First, irrespective of the absence of the legitimate-medical-purpose or usual-course-of-professional-practice standards from the express terms of § 841(a)(1), we have endorsed instructions placing the burden on the government in a § 841(a)(1) prosecution of a physician to prove beyond a reasonable doubt that the physician did not adhere to at least one of these standards. <u>See</u> <u>United States v. Nelson</u>, 383 F.3d 1227, 1231–32 (10th Cir. 2004) ("We conclude that the better view is that there was no error in the instruction. A practitioner has unlawfully distributed a controlled substance if she prescribes the substance either outside the usual course of medical practice <u>or</u> without a legitimate medical purpose." (emphasis added)); <u>accord</u> <u>United States v. Seelig</u>, 622 F.2d 207, 213 (6th Cir. 1980) ("[A] conviction under § 841(a)(1) requires the government to prove beyond a reasonable doubt that the drugs were distributed outside the usual course of professional practice."). Indeed, curiously, in the context of stressing the non-element status of these standards, without citation to

pertinent Tenth Circuit authority, the government signals its recognition that it bears the evidentiary burden regarding them. See Aplee. Br. (SJS) at 20 ("[T]he government must prove a doctor's prescriptions were not issued in the usual course of professional practice and for other than a legitimate medical purpose to prove the statute applies to the doctor, as well as to negate any good faith defense.").

Second, even if our precedent did not settle the issue, by failing to object before the district court to the court's instruction—requiring it to negate the fact that Dr. Schneider acted with a legitimate medical purpose or in the usual course of professional practice—the government became bound by the instructions as law of the case. See, e.g., United States v. Bader, 678 F.3d 858, 881 n.13 (10th Cir. 2012) ("[T]he government did not object to any possible error in this instruction and therefore was bound by it.").

Consequently, the legitimate-medical-purpose and usual-course-of-professional-practice standards are tantamount to express elements of § 841(a)(1), which the government must address in its case-in-chief. And the question thus remains whether the statute should be interpreted so as to require the government to prove that the Schneiders at least knowingly violated at least one of these standards; if so, the district court's instructions were error.

**3**

Drawing support from <u>Liparota</u> and <u>X-Citement Video</u>, the Schneiders urge us to adopt the holding of the Ninth Circuit in <u>United States v. Feingold</u>, 454 F.3d 1001 (9th Cir. 2006). <u>See</u> Aplt. Opening Br. (SJS) at 39 ("The same considerations that animated the Supreme Court's decisions in <u>Liparota</u> and <u>X-Citement Video</u> should lead this Court to adopt the holding of <u>Feingold</u> as the law of this Circuit."). In <u>Feingold</u>, the court held that, in order to convict a physician under § 841, the government must establish, <u>inter alia</u>, that he or she "acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice." 454 F.3d at 1008 (emphasis omitted).

However, on this record, I agree with the majority: the Schneiders can find little, if any, succor in <u>Feingold</u>. As the majority put it,

> <u>Feingold</u> provides little support because the instructions in <u>Feingold</u> were nearly identical to those in the instant case, and the court in <u>Feingold</u> held that the instructions "compelled the jury to consider whether [the defendant] intended to distribute the controlled substances for a legitimate medical purpose and whether he intended to act within the usual course of professional practice."

Maj. Op. at 14 (alteration in original) (quoting <u>Feingold</u>, 454 F.3d at 1009). Thus, even if the jury were required to find that Dr. Schneider (aided and abetted by Ms. Schneider) knowingly acted outside the usual course of professional practice or dispensed drugs for purposes that were not legitimate medical

-9-

purposes, following the Ninth Circuit's analysis in Feingold, I would conclude that the instructions given by the district court were not erroneous.

I underscore, however, that we need not decide on this record whether in fact there is such a mens rea requirement—that is, whether the government must prove that a physician defendant at least knowingly violated either the legitimate-medical-purpose or usual-course-of-professional-practice standards.  On this point, the majority agrees.  See Maj. Op. at 14 (noting that "we need not decide any mens rea requirement under § 841(a)(1)").  Therefore, for the foregoing reasons, like the majority, I reject the Schneiders' challenge to the § 841 instructions.

## C

I address here the Schneiders' challenge to the district court's good-faith instruction.  The Schneiders contend that, by reference to the "usual course of professional practice," this instruction logically precluded the jury from exculpating them on the grounds of good faith.  In brief, they argue that, because the jury must find that Dr. Schneider did not act in the usual course of professional practice to find them guilty of the 21 U.S.C. § 841 offenses, this finding would logically prevent the jury from also exculpating them on the grounds of good faith, insofar as the good-faith instruction conditioned a finding of good faith upon a determination that Dr. Schneider was acting in the usual

-10-

course of professional practice. In other words, reason the Schneiders, the good-faith instruction would require the jury to reach diametrically opposite findings regarding whether Dr. Schneider acted in the usual course of professional practice in order to exculpate him on the grounds of good faith. The Schneiders claim that the alleged error wrought by this instruction was plain and prejudicial.

**1**

The Schneiders did not raise an objection to the district court's good-faith instruction at trial. Therefore, as Dr. Schneider acknowledges, see Aplt. Opening Br. (SJS) at 46 n.12, we review their challenge to the good-faith instruction for plain error, see, e.g., Sturm, 673 F.3d at 1281. Significantly, for an error to be "plain" under this standard, it must be "clear or obvious error." United States v. McGehee, 672 F.3d 860, 876 (10th Cir. 2012); see United States v. Cooper, 654 F.3d 1104, 1117 (10th Cir. 2011) (noting that saying an error is "plain," "means clear or obvious under current law" (quoting United States v. Goode, 483 F.3d 676, 681 (10th Cir. 2007)) (internal quotation marks omitted)).

The district court's jury instruction on good faith reads as follows:

> [A] physician does not violate Section 841(a)(1) . . . when he dispenses a controlled substance in good faith to a patient <u>in the usual course of professional practice</u>.
>
> The term "good faith" means the honest exercise of good professional judgment as to a patient's medical needs. Good faith connotes an observance of conduct in accordance with what

-11-

the physician should reasonably believe to be proper medical practice.

R., Vol. 4, at 845 (Instruction No. 27) (emphasis added). The Schneiders argue that this instruction is plainly wrong because it permitted a jury to find that Dr. Schneider—as well as Ms. Schneider, as his aider and abettor—acted in good faith only if the jury also concluded that he was acting in the usual course of professional practice. See Aplt. Opening Br. (SJS) at 47.

They contend that instead, the jury should have been instructed that if it found Dr. Schneider was acting in good faith, then it should also find that he was acting in the usual course of professional practice. Id. The Schneiders succinctly state what they perceive to be the effect of this purported error:

> By conditioning a finding of "good faith" upon a finding that Dr. Schneider had acted "in the usual course of professional practice", the district court's instruction guaranteed that the jury could not conclude that Dr. Schneider had acted in good faith. That is because the district court's elemental instruction for the Section 841 charges required the jury to conclude that Dr. Schneider had not been acting "in the usual course of professional practice . . . ."

Id. (emphasis added). According to the Schneiders, "[t]his [good-faith instructional] error deprived Dr. Schneider [and Ms. Schneider] of [their] primary defense, thereby affecting [their] substantial rights and casting serious doubt upon the fairness of [their] trial." Id. at 50. Significantly, if the instructions were as the Schneiders would have it, a jury finding of good faith would be tantamount to

-12-

a determination that Dr. Schneider acted in the usual course of professional practice and, thus, would absolve him (and Ms. Schneider) of criminal liability on the § 841 charges.

Furthermore, in support of their argument, the Schneiders cite examples found in other circuit court decisions of what they view as correct good-faith instructions.  See United States v. Armstrong, 550 F.3d 382, 398 (5th Cir. 2008), abrogated on other grounds by United States v. Guillermo Balleza, 613 F.3d 432 (5th Cir. 2010); United States v. Williams, 445 F.3d 1302, 1309 (11th Cir. 2006), abrogated on other grounds by United States v. Lewis, 492 F.3d 1219 (11th Cir. 2007); United States v. Vamos, 797 F.2d 1146, 1152 (2d Cir. 1986).  Notably, they do not offer an example of such a favorable instruction from a Supreme Court or Tenth Circuit case.

The majority summarily rejects the Schneiders' challenge to the good-faith instruction, concluding that the Schneider's reading "parses the instruction too finely."  Maj. Op. at 16.  I have no quarrel with the majority's outcome.  I only write to clarify an appropriate foundation for it.  In particular, for at least two principal reasons, I would hold that the Schneiders' challenge cannot prevail on plain-error review because they cannot establish that the district court committed clear or obvious error.

**2**

First, even if conditioning a good-faith finding on a finding that Dr. Schneider actually acted <u>in</u> the usual course of professional practice could be considered error for the reasons articulated by the Schneiders, in my view, it would have been far from clear or obvious to the district court that its instructions had this effect. In other words, the district court would not have committed clear or obvious error (i.e., plain error) in using the instructions. The district court's definition of good faith could be read naturally as not focusing on whether Dr. Schneider actually acted in the usual course of professional practice, but rather whether a jury could find that Dr. Schneider held an objectively reasonable belief that he was so acting.

In this regard, the court instructed, "Good faith connotes an observance of conduct in accordance with what the physician <u>should reasonably believe</u> to be proper medical practice." R., Vol. 4, at 845 (emphasis added); <u>see also</u> Aplee. Br. (SJS) at 31 ("The defendants also overlook the fact that it is the second paragraph of the instruction, not the phrase they seize upon, that defines 'good faith' in the context of a doctor prescribing controlled substances."). Therefore, under this reading of the court's good-faith instruction, the jury could well find that Dr. Schneider did <u>not</u> actually act in the usual course of professional practice, but exculpate him of criminal liability on the grounds that he acted with a reasonable

belief that he was so acting—<u>viz.</u>, it could acquit the Schneiders on the basis that

Dr. Schneider acted with objectively reasonable good faith.  Put another way,

under this reading, it would not have been "logically impossible," as the

Schneiders assert, Aplt. Opening Br. (SJS) at 48, for the jury to acquit the

Schneiders on the basis of good faith, after first finding that Dr. Schneider

actually failed to act in the usual course of professional practice.

As such, the instruction's reference to the usual course of professional

practice simply would have served to ensure that the jury would only acquit Dr.

Schneider (as well as Ms. Schneider as an aider and abettor) on the basis of good

faith, when there was an objectively reasonable basis for his purported good-faith

conduct.  This outcome would have been entirely consistent with federal case law,

which has rejected a subjective standard of good faith, in favor of an objective

one.[2]  <u>See</u> <u>Williams</u>, 445 F.3d at 1309 ("[The defendant's] proposed instruction

---

[2]    Notwithstanding the important role that Dr. Schneider's purported "good faith" plays in the Schneiders' exculpatory effort, they fail to offer an alternative definition of the term.  They appear to contemplate a form of good faith that is at least primarily subjective.  The government certainly sees it this way.  <u>See</u> Aplee. Br. (SJS) at 32 ("[I]mplicit in the defendants' argument on appeal, and what the defendants explicitly requested below, is a <u>subjective</u> standard good faith instruction . . . ." (citation omitted)).  In this regard, the Schneiders argue as follows: "Although Dr. Schneider allowed that some mistakes may have been made, he testified that his decisions were in fact <u>motivated by the desire to help his patients</u> and based upon <u>his own best medical judgments</u>."  Aplt. Opening Br. (SJS) at 50 (emphases added).  As suggested <u>supra</u>, such a subjective standard would not be consistent with federal law.  <u>See</u> Aplee. Br. (SJS) at 32 (noting that "the courts have uniformly rejected" a subjective good-faith

(continued...)

-15-

fails to introduce any objective standard by which a physician's prescribing behavior can be judged. . . . Thus, the proposed instruction is contrary to [the Supreme Court's decision in] Moore."); United States v. Norris, 780 F.2d 1207, 1209 (5th Cir. 1986) ("The district court . . . correctly rejected [the defendant's] proposed charge premised on a theory that a standard medical practice may be based on an entirely subjective standard."); cf. Moore, 423 U.S. at 142 n.20 (noting that "[t]he jury was instructed that [the physician defendant] could not be convicted if he merely made 'an honest effort' to prescribe for detoxification in compliance with an accepted standard of medical practice" (emphasis added)).

I need not definitively decide whether my interpretation of the import of the district court's good-faith instruction is correct. The determinative point is that it would not have been clear and obvious to the district court that its good-faith instruction's reference to the usual course of professional practice would have had the allegedly impermissible effect of conditioning the jury's finding of good faith on its determination that Dr. Schneider was acting in the usual course of professional practice. Thus, the district court would not have committed clear or obvious error in using the instructions. Accordingly, on this basis, the Schneiders' challenge to the good-faith instruction could not prevail on plain-

---

[2](...continued)
standard).

error review.

The second reason that the Schneiders cannot establish that any error by the district court concerning the good-faith instruction was clear or obvious is even more fundamental. The Schneiders have not drawn our attention to any authority from the Supreme Court or the Tenth Circuit that has invalidated a good-faith instruction like the one here on a theory of error like the Schneiders advance. See, e.g., United States v. DeChristopher, 695 F.3d 1082, 1091 (10th Cir. 2012) ("In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." (quoting United States v. Thornburgh, 645 F.3d 1197, 1208 (10th Cir. 2011)) (internal quotation marks omitted)); United States v. Wardell, 591 F.3d 1279, 1298 (10th Cir. 2009) (noting that the defendant "does not identify any Supreme Court or Tenth Circuit decisions that have addressed" his constitutional claim). Generally, such a circumstance will close the door on a claim that the error at issue is clear or obvious. Further, the cases from other circuits that the Schneiders do cite are not directly on point and, insofar as they speak to the matter before us, they actually appear in significant respect to follow a similar path as the district court here, in imposing an objective standard on the good-faith defense. See, e.g., Armstrong, 550 F.3d at 398 (upholding instruction stating that "[a] controlled substance is prescribed by a physician in the usual course of professional practice, and therefore, lawfully, if the substance is prescribed by him or her in good faith,

-17-

medically treating a patient in accordance with a standard of medical practice generally recognized and accepted in the United States" (emphasis omitted)); Williams, 445 F.3d at 1309 (upholding an instruction with language similar to that here, stating that "good faith" "means that the doctor acted in accordance with what he reasonably believed to be proper medical practice"); Vamos, 797 F.2d at 1153 (discussing a good-faith instruction that indicates the term "means that the doctor acted in accord with what he reasonably believed to be proper medical practice" and holding that "an instruction that the jury should use an objective standard of reasonableness in deciding whether a practitioner acted in accord with what he believed to be proper medical practice is not improper and does not amount to error"). Accordingly, for at least these two reasons, consistent with the majority's outcome, I would hold that the Schneiders' challenge cannot prevail on plain-error review because they cannot establish that the district court committed clear or obvious error.

## II

I address here the Schneiders contention that there was insufficient evidence to convict them of health-care fraud resulting in death, pursuant to 18 U.S.C. § 1347.

## A

We review the record for sufficiency of the evidence de novo. See, e.g., United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997). When reviewing the

sufficiency of evidence underlying a verdict in a criminal case, we must affirm if, viewing all the direct and circumstantial evidence in the light most favorable to the government, a reasonable trier of fact would find the essential elements of the crime beyond a reasonable doubt. See, e.g., United States v. Suntar Roofing, Inc., 897 F.2d 469, 473 (10th Cir. 1990); United States v. Culpepper, 834 F.2d 879, 881 (10th Cir. 1987).

**B**

The Schneiders argue that the evidence presented was insufficient to support the jury's finding that any acts of alleged health-care fraud were the cause of any patient deaths. See Aplt. Opening Br. (SJS) at 51. Counts 7–9 charged the Schneiders not just with health-care fraud, but with health-care fraud resulting in the serious bodily injury/death of three individuals—Patricia, Eric, and Robin. See R., Vol. 4, at 149–53; 18 U.S.C. § 1347(a). The district court instructed the jury as follows: "For you to find that serious bodily injury or death resulted from the health care fraud committed by a defendant, the government must prove beyond a reasonable doubt that the individual's serious bodily injury or death was a result of the health care fraud alleged." R., Vol. 4, at 851. No challenge has been raised to this instruction on appeal. Like the majority, I conclude that the Schneiders' sufficiency-of-the-evidence challenge is without merit. I write separately to explicate the appropriate foundation for such a holding.

-19-

**1**

The Schneiders claim that "[t]here was no evidence presented at trial that possibly could support the conclusion that [their] alleged fraud itself was the cause of any harm to any patient, let alone the cause of anyone's death." Aplt. Opening Br. (SJS) at 52. More specifically, the Schneiders argue that there was insufficient evidence to support the jury's verdicts on the health-care fraud charges in Counts 7–9 because their alleged conduct in submitting bills to a health-care benefits program that contained false or misleading statements or omissions was not itself the cause of harm to any patients. Id. at 53.

Like the government, see Aplee. (SJS) Br. 59, the majority retorts that the Schneiders' health-care fraud scheme involved more than just the submission of false or misleading bills—viz., more than just their "upcoding and billing practices." Maj. Op. at 17. Instead, reasons the majority, the fraudulent scheme involved "the illegal distribution of drugs, which caused the deaths of three patients." Id. Generally speaking, I have no quarrel with the majority's response. However, the illegal distribution of drugs—by physicians or non-physicians—may take place quite apart from a health-care fraud scheme, that is, without a nexus to a health-care fraud scheme. In such a circumstance, deaths resulting from illegal drug distribution could not give rise to criminal liability under § 1347. Therefore, to bolster the majority's conclusion, I write to further define the contours of the nexus between the Schneiders' illegal drug distribution and their health-care

-20-

fraud; it is that nexus that permits the Schneiders to be held accountable under

§ 1347 for the deaths of the three individuals, Patricia, Eric, and Robin.

**2**

Section 1347 provides:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

18 U.S.C. § 1347(a).

The government presented sufficient evidence for a reasonable trier of fact

to find, first, that the Schneiders engaged in a health-care fraud scheme and,

second, that this scheme resulted in the deaths of three individuals. Considering

similar or analogous facts, the Sixth Circuit reached a very similar conclusion.

See United States v. Martinez, 588 F.3d 301, 321 (6th Cir. 2009) ("[A] rational

jury could have concluded that [the victim's] death was a foreseeable result of

-21-

[defendant's health-care fraud] conduct. [Defendant] over-prescribed controlled substances that led to [the victim's] addiction to narcotics, and [defendant] continued to perform unnecessary injections and prescribe harmful medications despite the presence of the clear 'red flags' of escalating addiction.").

Other circuit courts also have issued rulings under various rationales that support the conclusion here. See United States v. Merrill, 513 F.3d 1293, 1297–98 (11th Cir. 2008) (concluding that there was sufficient proof to support a § 1347 conviction resulting in death, where, inter alia, the "testimony and the documentary evidence demonstrated that [defendant] wrote multiple prescriptions for similar controlled substances for the same patient during the same visit; that he wrote prescriptions for patients on whom he performed no or very minimal physical examination" and "that he wrote prescriptions for patients whose behavior and physical appearance should have raised suspicion that they were addicted to controlled substances"); cf. United States v. Webb, 655 F.3d 1238, 1246–47, 1255–58 (11th Cir. 2011) (detailing a physician's illegitimate prescription-prescribing practices with regard to a patient who died, in connection with rejecting defendant's challenge to a jury instruction explicating the § 1347 offense resulting in death).

Expert testimony and the Schneiders' own records revealed at trial that their actions resulted in Patricia, Eric, and Robin becoming addicted to prescription drugs. See, e.g., R., Vol. 13, at 3132, 3138–39, 3181–82; R.,

Vol. 14, at 516. As these patients' conditions grew worse, Dr. Schneider's response was to escalate their prescription drugs, which eventually led to their deaths from overdoses. See, e.g., R., Vol. 13, at 3132, 3181–82; R., Vol. 14, at 516–17, 525–35. The evidence supports the jury's finding that these patients died from their prolonged treatment outside and contrary to the usual course of professional medical practice—a pattern of treatment for which Dr. Schneider and Ms. Schneider submitted false and fraudulent claims to health-care benefit programs. See, e.g., R., Vol. 13, at 3149–51; R., Vol. 14, at 531–35. These claims were false and fraudulent because, inter alia, they were claims for services not rendered—viz., the claims were reportedly for the provision of legitimate services rendered in the usual course of professional practice, when in fact Dr. Schneider (aided and abetted by Ms. Schneider) furnished illegitimate services and prescriptions, contrary to and outside of the usual course of professional practice.

Viewing this evidence in the light most favorable to the government, see Suntar Roofing, 897 F.2d at 473, a reasonable factfinder could conclude beyond a reasonable doubt that Dr. Schneider and Ms. Schneider were involved in a health-care fraud scheme; that a key component of it was the provision of medical services outside the usual course of professional practice through the illegal distribution of drugs—for which false or fraudulent bills were submitted to health-care benefit programs; and that, as a result of the provision of such

-23-

medical services, three individuals (Patricia, Eric, and Robin) died. Thus, for the foregoing reasons, like the majority, I reject the Schneiders attack on the sufficiency of the evidence to support their § 1347 convictions.

### III

I concur in much of the majority's opinion—fully joining Parts A and B and the portions of Part C not visited here—and also concur in the majority's ultimate ruling affirming the district court's judgment.